**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**QUINTAURUS L. JOHNSON**,

    Plaintiff,

v.                                                        Case No. 8:24-CV-02195-WFJ-NHA

**DEPARTMENT OF JUVENILE**
**JUSTICE**, **ANDREW CORREA**,
**MATTHEW CLARK**, and
**ROSA ARDITO**, **PAUL SHEFFER**
and **SEAN SKILLERN**,

    Defendants.

_____/

**<u>ORDER</u>**

Before the Court are Defendants Florida Department of Juvenile Justice ("DJJ") and Andrew Correa, Matthew Clark, Rosa Ardito, Paul Sheffer, and Sean Skillern's (jointly, the "Individual Defendants") motions for summary judgment. Dkts. 106, 107, 108, 109, 110, 115. Plaintiff Quintaurus L. Johnson, proceeding *pro se*, has filed responses in opposition, Dkts. 145, 146, 147, 148, 149, 159, 161, and Defendants have replied. Dkts. 152, 153, 154, 155, 156. Relevant evidence has been provided by both parties. Dkts. 104, 113, 151. After careful consideration, the Court grants Defendants' motions for summary judgment.

**BACKGROUND**

### I.   Factual History

In 2015, Plaintiff was hired by DJJ as a juvenile probation officer ("JPO") and remains employed in this same position. Dkt. 104-1 at 10:2–13. According to Plaintiff, the position's responsibilities include monitoring and supervising youth sentenced to probation, with duties performed both in the office and in the field. Dkt. 104-1 at 16:11–12, 17:6–8.

On May 28, 2019, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against DJJ, alleging sex discrimination, naming his then supervisor and Chief, who are not parties to the present litigation. Dkt. 104-7.

From September 2021 until November 2022, Defendant Ardito held the position of Juvenile Probation Officer Supervisor ("JPOS") for Plaintiff's team. Dkt. 108-1 ¶ 1. In that capacity, she directly supervised Plaintiff's team. *Id.*

On January 20, 2022, Plaintiff received a counseling memo from Defendant Ardito. Dkt. 113-2. This memo was prompted by an incident in which a youth assigned to Plaintiff was involved in the murder of another individual. Dkt. 104-1 at 45:19–21, 50:7–24. Plaintiff's case notes for this youth were consequently audited and reportedly found to be deficient. Dkt. 104-2 ¶ 3. Specifically, it was found that Plaintiff did not adhere to DJJ policy by failing to timely refer this youth to certain

services and by missing a monthly face-to-face contact with the youth. Dkt. 113. Plaintiff claims that this counseling memo constituted "baseless disciplinary action." Dkt. 36 ¶ 18. An EEOC investigator later found that there was "no evidence gathered" to show that this counseling memo was "based on retaliation." Dkt. 36-1 at 4–5.

On June 3, 2022, Plaintiff made a complaint to HR regarding "the administration and [his] supervisor" at the time, Defendant Ardito. *Id.* at 17. No details are on the record regarding the subject of this complaint.

On April 20, 2022, Plaintiff documented in his case notes that he conducted a home visit for a youth assigned to him. Dkt. 104-8 at 1. On April 25, 2022, the youth's mother called Defendant Ardito to report that their video surveillance on April 20 showed that Plaintiff did not attempt a home visit at any point. *Id.* Defendant Ardito made a report to the DJJ's Central Communications Center ("CCC") hotline regarding this reported discrepancy and apparent falsification. *Id.* (this report stated, "[Defendant Ardito] was contacted by the mother of [the youth], and alleged that [Plaintiff] did not conduct a home visit on 4/20/22. According to the mother, she reviewed her home video surveillance and it does not show [Plaintiff] coming by the residence on that documented date. [Plaintiff] documented in the case notes that a home visit was conducted on 4/20/22.").

3

Once the report was made, Defendant Ardito was not involved in the ensuing investigation. *See id.* (showing Defendant Ardito's involvement limited to her being the "Reporting Person"); *see also* Dkt. 104-2 ¶ 4. Plaintiff claims that Defendant Ardito initiated this CCC report against him "without justification, triggering unwarranted scrutiny," Dkt. 36 ¶ 13, and that she "ignore[d] evidence provided by Plaintiff on May 9, 2022," Dkt. 146-1 ¶ 6, which consisted of an email to Defendant Ardito where Plaintiff claims that the youth's mother initially filed this report as "retaliation for [Plaintiff] reporting her to DCF." Dkt 151-2 at 19.

On May 3, 2022, Defendant Ardito provided Plaintiff with a notice regarding the complaint and ongoing investigation, advising him that the investigation did not imply that he was guilty of wrongdoing. Dkt. 113-3. Plaintiff refused to sign this notice. *Id.* at 2. An EEOC investigator later found that there was "no evidence gathered" to show that this notice was "based on retaliation"; instead, its purpose was merely to "inform [Plaintiff] of the complaint received." Dkt. 36-1. Ultimately, the investigation ended with no further action being taken because "there was not enough evidence to support or refute the mother's allegations," as the "surveillance video she reportedly viewed to make her claim [was] no longer available." Dkt. 104-8 at 2.

Shortly after Plaintiff was advised of the investigation, he approached Defendant Ardito's office and stated that he would take action if she reported him to

4

the CCC again. Dkt. 104-2 ¶ 5 (Defendant Ardito claims that Plaintiff said that if she reported him again "there was going to be a problem"); Dkt. 151-2 at 10 (Plaintiff claims that he said the "next time you report me I am going to report you and administration to Tallahassee"). Defendant Ardito felt threatened by Plaintiff, so she reported the incident to her supervisor and to the CCC, but no action was taken because Plaintiff's statement lacked specificity. Dkt. 104-2 ¶ 5; Dkt. 146-1 ¶ 8 ("The CCC . . . determined the June 2, 2022, incident was 'non-reportable' because it lacked a specific threat."). Defendant's supervisor eventually provided Plaintiff with an Employee Assistance Program ("EAP") referral due to this incident. Dkt. 104-2 ¶ 5. Plaintiff claims that Defendant Ardito "fabricated claims of hostility to justify [the] EAP referral." Dkt. 36 ¶ 14.

On June 16, 2022, Plaintiff acknowledged the receipt of a performance evaluation drafted by Defendant Ardito. Dkt. 104-9 at 6. Defendant Ardito scored Plaintiff's performance as 3.25 out of 5, indicating "satisfactory" performance, and provided areas for improvement. *Id.* ("There have been some client complaints that he can be hard to get in touch with and some requests to be switched to another JPO due to this. [Plaintiff] could improve his customer service skills by returning phone calls in a timely manner."). Plaintiff challenged this evaluation, but it was eventually reviewed and approved both by Defendant Ardito's supervisor and the second-level supervisor. Dkt. 104-2 ¶ 6. Plaintiff claims that this evaluation constituted a

5

"retaliatory negative performance review . . . , filled with inaccuracies, deliberately aimed at discrediting the Plaintiff's work." Dkt. 36 ¶ 128. Plaintiff has compared this performance evaluation with one received on June 22, 2021, which scored Plaintiff's performance as 4.50 out of 5, indicating "outstanding" performance. Dkt. 151-2 at 27–30. An EEOC investigator later found that "there was no evidence gathered to show that [the] lower performance plan appraisal . . . [was] based on retaliation," and that "it is not unusual for ratings to increase or decrease each performance year." Dkt. 36-1.

On August 12, 2022, Plaintiff filed an additional charge with the EEOC, alleging retaliation by certain DJJ employees for his filing of the previous charge of harassment. Dkt. 104-10. This is the EEOC charge that gave rise to the present case. *See* Dkt. 36 ¶ 19 ("The EEOC completed its investigation in May 2024 and issued a Right-to-Sue letter soon after, enabling the Plaintiff to pursue his claims in court.") The entirety of Plaintiff's 2022 charge reads as follows:

> I began employment with the Department of Juvenile Justice on July 21, 2015, as a Juvenile Probation Officer. I continue to be harassed since filing a previous charge. I believe I am being "pushed out" by my new supervisor and management due to action being taken against me, for having a current lawsuit and for making complaints of harassment since filing with the EEOC. On my 2021 Annual Performance Appraisal I scored a 4.2 [sic] (Outstanding), however my most recent Performance Appraisal in June 2022, I received a score of 3.2 [sic] (Average) by Supervisor Rosa Ardito. I have recently received 2 counseling's and have had 5 meetings with management and union regarding accusations of allegedly falsifying reports, failure to make contact, and not always being at work, which I denied. I was accused

of having "a rough couple of years" and that I may need therapy. I believe I am being targeted for termination and nothing is being done to resolve the issues. I believe I have been retaliated against for complaining of the continued harassment and filing a previous charge with the EEOC in violation of Title VII of the Civil Rights Act of 1964, as amended.

Dkt. 104-10.

From March 2023 until October 2024, Defendant Correa held the position of Assistant Chief Probation Officer. Dkt. 104-3 ¶ 1. In this capacity, he served as a supervisor over Plaintiff's team. *Id.*

In March 2023, Plaintiff applied for the position of Assistant Chief Probation Officer. Dkt. 115-1 ¶ 53. The only applicants considered were those with DJJ supervisory experience, which excluded Plaintiff, who had none. *Id.*; Dkt. 113-1 at 3. Plaintiff also applied for the position of Chief Probation Officer. Dkt. 115-1 ¶ 54. The only applicants considered were those with at least three years of supervisory experience, which similarly excluded Plaintiff. *Id.*; Dkt. 113-1 at 3. Plaintiff therefore did not receive either the Assistant Chief or the Chief Probation Officer position. Dkt. 115-1 ¶¶ 53–54.

In June 2023, while serving as Assistant Chief Probation Officer, Defendant Correa was a member of an interview board for the position of Operations Coordinator, a position Plaintiff applied for. Dkt. 104-3 ¶ 4; Dkt. 113-1 at 2. After interviewing Plaintiff for the position along with other qualified applicants, the interview board selected an applicant other than Plaintiff who Defendants claim

7

"scored higher and performed better in the interview than all other interviewees." Dkt. 104-3 ¶ 4; *see* Dkt. 113-1 at 2; *see also* Dkts. 113-5, 113-6 (showing the resumes for Plaintiff and the selected applicant). However, internal documents show that the selected applicant and Plaintiff both received the same score—25.00, Dkt. 151-6 at 3, and that Plaintiff had a veteran's preference applied to his application. *Id.* at 6.

From March 2024 until January 2025, Defendant Clark held the position of Juvenile Probation Officer Supervisor for Plaintiff's team. Dkt. 104-4 ¶ 1. In that capacity, he directly supervised Plaintiff's team. *Id.* On March 27, 2024, Plaintiff made a complaint to Defendant Correa regarding Defendant Clark, alleging micromanagement and harassment. Dkt. 36-1 at 18–19.

On May 10, 2024, the EEOC generated a right to sue letter for Plaintiff's 2022 EEOC Charge. Dkt. 104-11. Acting upon this letter, Plaintiff began litigating the present case on August 5, 2024. Dkt. 1-1. Proceeding without counsel, Plaintiff sued DJJ and certain employees in Florida state court. *Id.* at 1–22. On September 17, 2024, this case was then removed to federal court. Dkt. 1.

At some point during his supervision of Plaintiff, Defendant Clark had issues with Plaintiff's job performance, which Clark discussed with him. Dkt. 104-4 ¶ 2. For example, Defendant Clark reported that the family of a youth assigned to Plaintiff complained they were not being properly visited in accordance with DJJ policies. *Id.* ¶ 3. According to Defendant Clark, the family disputed Plaintiff's case

8

notes that reflected proper visitation. *Id.* When Defendant Clark met with Plaintiff to discuss this issue, Plaintiff walked out of the meeting and refused to return. *Id.* Later, Defendant Clark reportedly discovered discrepancies in Plaintiff's timesheet. *Id.* ¶ 4. When Plaintiff met with DJJ management about the matter, he again walked out of the meeting. *Id.* Plaintiff asserts that the allegations of improper visitation and timesheet discrepancies were "baseless claims used to intimidate him." Dkt. 145-1 ¶¶ 4–5.

On June 6, 2024, Plaintiff filed a complaint with HR regarding Defendant Clark, alleging micromanagement, harassment, and falsification. Dkt. 36-1 at 15–16; Dkt. 151-1 at 12–13. Also in June 2024, Defendant Correa attended a meeting where a discrepancy with Plaintiff's time sheet submissions was discussed with Plaintiff and his direct supervisor, Defendant Clark. Dkt. 104-3 ¶ 3 (listing the date of this meeting as April or May 2024); Dkt. 151-1 at 16–17 (listing the date of this meeting as June 2024 and recounting Plaintiff's contemporaneous recollection). Plaintiff's timesheet allegedly did not match his documented case notes and he was told that working extra time that is not documented could be perceived as falsification and that his time worked needed to be reflected on his timesheet. Dkt. 104-3 ¶ 3; Dkt. 151-1 at 16–17 ("If you're working extra, that needs to be reflected . . . even if we owe you money."). Plaintiff claims that such allegations regarding his timesheet were "fabricated." *See, e.g.*, Dkt. 36 ¶¶ 25, 79, 99, 107.

In mid-2024, Defendant Clark drafted a performance evaluation for Plaintiff. Dkt. 104-4 ¶ 5. Defendant Clark initially scored Plaintiff's performance as 1 out of 5. *See id.* ("Based upon my experience supervising [Plaintiff], I wanted to score him under a three (out of five)[.]"); Dkt. 151-1 at 23 (describing the initial performance evaluation as rating Plaintiff with "all 1's"). After Plaintiff complained about the score, Dkt. 104-1 at 41:12–42:5, Defendant Clark learned that he could not maintain the initial rating because the prior year's evaluation lacked objective performance goals against which Plaintiff's current performance could be assessed. Dkt. 104-4 ¶ 5. Therefore, Defendant Clark ultimately scored Plaintiff's performance as 3 out of 5, or "meeting expectations." *See id.*; Dkt. 104-1 at 41:12–42:5.

On August 19, 2024, Plaintiff made a complaint to HR regarding Defendant Clark, alleging an unfair performance evaluation. Dkt. 36-1 at 20. On September 30, 2024, Plaintiff made a complaint to HR regarding Defendant Clark, alleging unwarranted criticism, baseless accusations, and a toxic work environment. *Id.* at 12–13; Dkt. 151-1 at 34–35. HR found that the allegations were "not based on a protected class as defined by applicable civil rights laws." Dkt. 36-1 at 11; Dkt. 151-1 at 35.

From October 2024, Defendant Sheffer has served as the acting Chief over Plaintiff's team, in addition to his position as Chief Probation Officer. Dkt. 104-6 ¶

1. He remains employed in this position. *Id.* In this capacity, he directly supervises Plaintiff's team. *Id.*

On October 9, 2024, while Defendant Sheffer was acting Bureau Chief, Hurricane Milton damaged certain DJJ offices, and employees, including Plaintiff, were moved to temporary remote status while an alternative office location was secured. *Id.* ¶ 2; Dkt. 104-13 at 1. On November 20, 2024, Plaintiff voiced concerns to Defendant Sheffer by email about overcrowding and safety violations, sanitation and hygiene deficiencies, and inadequate ventilation and water damage concerns. Dkt. 104-13 at 1; Dkt. 151-1 at 8–9. On December 5, 2024, Plaintiff emailed further concerns regarding mold and COVID-19 exposure, Dkt. 104-13 at 1–2, on December 6, 2024, Plaintiff reiterated similar health-related concerns, Dkt. 151-1 at 10, and on December 18, 2024, Plaintiff further mentioned a lack of organization, ineffective communication, micromanagement, distrust, unfair workloads, and unprofessional behavior. Dkt. 104-13 at 2.

In December 2024, Plaintiff submitted an ADA accommodation request, which was temporarily granted during its consideration. Dkt. 104-6 ¶ 2. On January 16, 2025, Defendant Sheffer provided Plaintiff with notice that his teleworking accommodations were revoked because further accommodations would be "unduly extensive, substantial or disruptive, or fundamentally alter the nature or operation of DJJ business." Dkt. 104-12 (quoting EEOC guidance document on ADA

11

implementation). The notice stated that DJJ was "unable to accommodate [Plaintiff's] request at this time due to there being no legitimate concerns which have not been addressed." *Id.* Plaintiff claims that this revocation was "clearly retaliatory in nature." Dkt. 36 ¶ 115.

On the same day, Defendant Sheffer responded in writing to Plaintiff to further address his concerns and explain the revocation of his accommodations. Dkt. 104-13 at 1–3. Defendant Sheffer stated that the workplace was assessed and regularly cleaned, all relevant regulations were followed, and that all workplace concerns had been promptly addressed. *Id.* Regarding Plaintiff's allegations of unfair workloads, Defendant Sheffer reported to Plaintiff that the case assignments for Plaintiff's team appeared reasonably balanced—Plaintiff landed approximately in the middle of the distribution with 14 new assignments, while other team members had 10, 12, and 15 new assignments. *Id.* at 2; *see* Dkt. 104-15 at 3.

On January 23, 2025, Plaintiff submitted a health-related complaint regarding workplace conditions to the Florida Department of Health. Dkt. 151-5 at 25–26. On February 5, 2025, Plaintiff authored an internal complaint against Defendant Sheffer. Dkt. 104-1 at 62:10–14. No evidence is on the record regarding the details of this internal memo.[1]

---

[1] In his Third Amended Complaint, Plaintiff asserts that this memo alleged "hostile work environment, racial discrimination, and retaliation." Dkt. 36 ¶ 40. Aside from this claim, no supporting evidence has been provided by Plaintiff. The Court is left with no evidence substantiating the details of this internal memo. Although the Court views all evidence and draws all reasonable inferences in favor of Plaintiff, the Court declines to credit this unsupported

On February 7, 2025, Plaintiff filed a Charge of Discrimination with the Florida Commission on Human Relations ("FCHR"), alleging color discrimination, disability discrimination, and retaliation at the new office location by both Defendants Clark and Sheffer. Dkt. 104-14. Plaintiff did not check the box for race discrimination. *Id.* Specifically regarding retaliation, he alleged excessive case assignments and being forced to return to the workplace. *Id.* The FCHR provided Plaintiff with a determination of no reasonable cause on August 4, 2025. Dkt. 104-16.

On March 5 and March 12, 2025, Plaintiff made further complaints to Defendant Sheffer about unfair workloads, workplace concerns, and retaliation. Dkt. 104-15. Defendant Sheffer responded on March 18, 2025, by again explaining that all concerns had been addressed. *Id.* at 2–3. Defendant Sheffer further analyzed Plaintiff's workload as of March 18, 2025, finding that Plaintiff was assigned 13 new assignments, while other team members had 11 and 14; furthermore, it was found that Plaintiff had a total of 45 probation cases assigned to him, while other team members had 47 and 50 probation cases assigned to them. Dkt. 104-15. Plaintiff's workload again appeared to land in the middle of the distribution. Plaintiff

---

allegation. *See* Fed. R. Civ. P. 56(a); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation modified) ("For factual issues to be considered genuine, they must have a real basis in the record. For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

maintains that he was subjected to "increased workloads" as retaliation for protected expression. *See, e.g.*, Dkt. 36 ¶¶ 37, 41, 66, 69, 71, 81.

On March 27, 2025, Plaintiff received an oral reprimand from his supervisor at the time, which alleged that he violated certain standards related to poor performance, negligence, inefficiency or inability to perform duties, insubordination, and violation of law or agency rules. Dkt. 151-5 at 38. Specifically, it was claimed that Plaintiff failed to complete numerous overdue assignments provided to him. *See id.* at 38–39 (listing 18 different cases where Plaintiff failed to complete required assignments). Plaintiff failed to request assistance when it was offered, and instead appears to have threatened disciplinary action. *See id.* at 36–37 ("This is my last warning before I escalate this issue to headquarters. . . . If you don't want to be in the mix I suggest you refrain from appearing to single me out.").

Due to these assignments not being completed in the necessary timeframe, Plaintiff was provided with the oral reprimand in "an effort to correct the . . . unacceptable behavior." *Id.* at 41. During a meeting to discuss this reprimand, Plaintiff reportedly walked out of the meeting saying "we are not doing this," then returned to tell his supervisor that she was "going to regret doing this." Dkt. 151-6 at 45. His supervisor felt threatened and made a report of this behavior. *Id.* at 31. Lakeland Police later found that "[n]o threat was made," and that the supervisor "just

14

wanted to notify police." *Id.* at 37. Plaintiff refused to sign a notice of investigation dated April 14, 2025, regarding this incident. *Id.* at 46.

At some point following the oral reprimand, Plaintiff submitted a complaint to HR regarding his assignments. He alleged "targeted discipline cloaked in policy, performance mischaracterized to justify punishment, and retaliation disguised as routine oversight." Dkt. 151-5 at 33–35.

On March 31, 2025, the parent of two youths reported to DJJ that Plaintiff failed to meet with them in person, and only communicated over the phone. Dkt. 151-6 at 43. Furthermore, the parent expressed concern regarding the delays in Plaintiff's responses, the failure to provide certain information to the youth, and Plaintiff's agitation when the parent requested to speak with his supervisor. *Id.* Plaintiff refused to sign a notice of investigation dated April 14, 2025, regarding this incident. *Id.* at 44.

On April 1, 2025, before being appointed to his current position, Defendant Skillern was brought into a meeting by the current supervisor for Plaintiff's team. Dkt. 151-4 at 7. In attendance at the meeting were a youth assigned to Plaintiff and the youth's grandmother. *Id.* The grandmother complained about certain aspects of Plaintiff's job performance, including "failure to remove the youth's cell phone as ordered by the court, lack of home visits, refusal to communicate with her regarding [the youth's] progress, failure to speak with guardian when visiting the school, and

15

failure to hold the youth accountable to the terms of her probation." *Id.*; Dkt. 151-6 at 41. She was given a grievance form to complete, detailing her complaints in writing. Dkt. 151-4 at 7; *see* Dkt. 104-1 at 105:1–9. Immediately after this meeting, Plaintiff reportedly "contacted the grandmother of [the youth] and spoke to [her] and accused her of lying," after which the grandmother requested that Plaintiff no longer contact her. Dkt. 151-6 at 41. Plaintiff claims that Defendant Skillern "induce[d] [the] client's guardian to file a grievance against the Plaintiff—a tactic clearly intended to undermine the Plaintiff's credibility and chill his protected speech." Dkt. 36 ¶ 110. Plaintiff refused to sign a notice of investigation dated April 14, 2025, regarding this incident. Dkt. 151-6 at 42.

From April 4, 2025, Defendant Skillern has held the position of Juvenile Probation Officer Supervisor. Dkt. 104-5 ¶ 1; Dkt. 151-6 at 18 ¶ 11. He remains employed in this position. Dkt. 104-5 ¶ 1. In this capacity, he directly supervises Plaintiff's team. *Id.*

Shortly after being appointed as Juvenile Probation Supervisor, Defendant Skillern signed off on the revocation of Plaintiff's telework accommodation. Dkt. 110-1 ¶¶ 5–6; Dkt. 104-1 at 108:6–14. This revocation was decided upon by Plaintiff's former supervisor due to the aforementioned oral reprimand received by Plaintiff; Defendant Skillern was not involved in the decision. *Id.* Plaintiff submitted

multiple complaints to HR objecting to this revocation on April 17 and 18, 2025, in which Plaintiff made claims of ADA-related retaliation. Dkt. 151-5 at 6–11.

On April 20, 2025, Plaintiff submitted a complaint to the Florida Inspector General. Plaintiff complained that his separate DJJ Office of Inspector General whistleblower complaint was disclosed in the present litigation. Dkt. 151-6 at 11–12.

## II.   Procedural History

Plaintiff has filed four complaints here. Dkts. 20, 21, 35, 36. Plaintiff's Third Amended Complaint brings the present claims. Dkt. 36. Against DJJ are claims of: Retaliation under Title VII (Count I); Retaliatory Hostile Work Environment under Title VII (Count III); Retaliatory Failure to Promote under Title VII (Count IV); Preliminary Injunctive Relief (Count V); and Violation of the Florida Whistleblower Act (Count VII). *Id.* Against the Individual Defendants is a single claim of First Amendment Retaliation under 42 U.S.C. § 1983 (Count II). *Id.* The Court previously dismissed Count VI. Dkt. 24; Dkt. 36 at 34–35 ("[Count VI] was previously dismissed by the Court. It is included herein solely to preserve the procedural history of the case. Plaintiff does not reassert this claim and does not seek relief under this Count in the Third Amended Complaint."). Plaintiff claims that the retaliation has continued during the pendency of this case. *See* Dkt. 36 ¶ 2.

17

The Court's Case Management & Scheduling Order initially set the discovery cut-off for June 20, 2025. Dkt. 29. Plaintiff filed a motion to compel discovery on May 24, 2025, Dkt. 45, which made June 23, 2025, the response deadline for Defendants. *See* Fed. R. Civ. P. 36(a)(3) (providing 30 days to respond). Plaintiff then filed a motion seeking to shorten Defendants' response deadline so that Plaintiff could have an opportunity to compel further responses before the discovery cut-off. Dkt. 50. This motion was denied by the Magistrate Judge, as it was found to be "Plaintiff's responsibility to timely serve his discovery requests such that responses would be due within the discovery period." Dkt. 51. However, the Magistrate Judge later granted Plaintiff's motion to extend the discovery period and thus extended the cut-off to June 24, 2025, "for the limited purpose of permitting Defendants to respond to Plaintiff's May 24, 2025, Requests for Admission." Dkt. 58. The cut-off for "all other discovery and all motions to compel not related to those requests for admissions [was to] remain June 20, 2025." *Id.*

The Court notes that Plaintiff filed multiple ensuing discovery-related motions, including further motions to compel and motions for sanctions, *see* Dkts. 45, 64, 74, 83, 85, 92, 117, 118, 126, 127, which led the Court to issue orders compelling DJJ to properly respond to discovery requests. *See* Dkts. 79, 91, 94, 121, 125, 132. DJJ's failures concerned documents without required metadata, incomplete production, and inadequate privilege logs. Dkt. 132 at 2–5. At the time

18

summary judgment motions and responses were filed, the only missing discovery was the metadata associated with select emails. Dkt. 125 at 8. On October 28, 2025, the Magistrate Judge determined that DJJ was responsible for noncompliance and found sanctions warranted, ordering DJJ to pay Plaintiff's requested $600 in sanctions, Dkt. 132 at 7, which was timely paid. Dkt. 134. On November 13, 2025, the Magistrate Judge reiterated that the "cut-off for discovery and all motions to compel . . . was June 20, 2025." Dkt. 138. It was concluded that the Court had "ruled on all outstanding discovery issues," and that "[n]o further discovery motions or notices should be filed in this action." *Id.*

After Defendants filed the present motions, Plaintiff's initial responsive filing failed to address to the merits of Defendants' motions, did not contest Defendants' accompanying statements of facts, *see* Dkts. 106-1, 107-1, 108-1, 109-1, 110-1, 115-1, and failed to include a separate Statement of Disputed Facts. *See* Dkt. 119. Plaintiff instead utilized his response to merely raise further discovery-related objections pursuant to Fed. R. Civ. P. 56(d), Dkt. 119, which were untimely in light of the resolution of all outstanding discovery issues. Dkt. 138. Pursuant to Eleventh Circuit caselaw noting that courts "should be particularly careful to ensure proper notice to a *pro se* litigant," *Horton v. Gilchrist*, 128 F.4th 1221, 1226 (11th Cir. 2025) (quoting *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1368 (11th Cir. 2007)); *see Couch v. Clark*, 725 F. App'x 808 (11th Cir. 2018), the Court notified

19

Plaintiff of his deficient response and allowed him additional time to file a substantive response to avoid the Court deeming the material facts of Defendants' motions as admitted. Dkt. 141. Plaintiff did so, and filed relevant responses, Dkts. 145, 146, 147, 148, 149, 150, 161, and evidence. Dkt. 151.[2]

Plaintiff's response to Defendant DJJ's Motion for Summary Judgment regarding Count I, III, IV, V, and VII was then struck by the Court, Dkt. 158, as it cited to hallucinated cases. *See* Dkt. 150 at 7, 13, 16 (citing *Watson v. Amedisys Holding, LLC*, 298 F. App'x 395, 396 (5th Cir. 2008), *Martin v. Dep't of Corrections*, 682 So. 2d 331, 333 (Fla. 5th DCA 1996), and *Campbell v. DCF*, 201 So. 3d 164, 170 (Fla. 1st DCA 2016), which are non-existent). The Court granted Plaintiff leave to refile his response with proper citations, Dkt. 158, and he did so. Dkt. 159.

## LEGAL STANDARD

A district court should grant summary judgment when it determines that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] In Plaintiff's most recent responses, he continues to raise issues related to discovery. *See, e.g.*, Dkt. 145 at 17; Dkt. 146 at 14–16; Dkt. 147 at 18–19; Dkt. 148 at 16; Dkt. 149 at 12–13; Dkt. 150 at 16–18; Dkt. 159 at 16–18; Dkt. 160 at 4; Dkt. 161 at 16; Dkt. 167 at 5. In light of the aforementioned holdings, the Court declines to consider these issues.

A genuine dispute means evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of a moving party "varies depending on which party would bear the burden of proof on a disputed issue at trial." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024) (citing *Fitzpatrick v. City of Atl.*, 2 F.3d 1112, 1115 (11th Cir. 1993)). "With regard to issues on which the non-moving party bears the burden of proof, the moving party need not support its motion with evidence negating the opponent's claim." *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (citation modified). Instead, the moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–58 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). Further, although a *pro se* complainant "is entitled to a liberal interpretation" of his pleading, he is not excused from meeting the "essential burden under summary judgment standards of establishing that there is a

21

genuine issue as to a fact material to his case." *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).

## DISCUSSION

### I.   Count I: Retaliation under Title VII

Defendant DJJ seeks summary judgment on Count I, which alleges "unlawful retaliation against the Plaintiff for his protected whistleblowing activities" under Title VII. Dkt. 36 ¶ 93.

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). A plaintiff may support a claim of retaliation by offering either direct or circumstantial evidence. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).

In the absence of direct evidence of retaliation—as is the case here—the Court evaluates the claim by using the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a prima facie case of retaliation. *See Young v. UPS*, 575 U.S. 206, 213 (2015). A prima facie retaliation claim under Title VII requires the plaintiff to establish that "(1) he engaged in statutorily protected expression . . . ; (2) he suffered an adverse employment action; and (3) the adverse action was causally

related to the protected expression." *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 876 (11th Cir. 2025) (citation omitted). If a prima facie case of retaliation is established, the burden then shifts to the defendant employer to articulate a legitimate, non-retaliatory reason for its actions. *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998).

Alternatively, "an employee may always prove a claim of discrimination by presenting sufficient evidence that would 'permit[] a reasonable factfinder to find that the employer [discriminated] against the employee,'" even if the employee does not rely on the *McDonnell Douglas* burden shifting framework. *Melton v. I-10 Truck Ctr. Inc*, No. 23-14175, 2026 WL 319183, at *3 (11th Cir. Feb. 6, 2026) (quoting *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310–11 (11th Cir. 2023)).

### a. Statutorily Protected Expression

The first element of a prima facie retaliation claim under Title VII is a "statutorily protected expression," which is defined by 42 U.S.C. § 2000e–3(a). *See E.E.O.C. v. Total System Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000). Under this statute, an employer may not discriminate against an employee because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]," (participation clause), or because "he has opposed any practice made an unlawful employment practice by [Title VII]" (opposition clause). 42 U.S.C. § 2000e–3(a); *see Total System Servs.*, 221 F.3d at

23

1174. The participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC," requiring the plaintiff to have "participat[ed] in the machinery set up by Title VII to enforce its provisions." *Total System Servs.*, 221 F.3d at 1174 (citation omitted).

As an initial matter, the Court recognizes that the May 28, 2019, EEOC charge, the August 12, 2022, EEOC charge, and the August 5, 2024, initiation of the present litigation, which arose from the 2022 EEOC charge, are certainly considered "statutorily protected expression" under the participation clause. *See Vincent v. Jefferson Cnty. Bd. of Educ.*, 152 F.4th 1339, 1353 (11th Cir. 2025) (holding that "protected activity includes . . . filing formal EEOC complaints"); *Total System Servs.*, 221 F.3d at 1174 ("[The participation] clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC."); *see also Tolar v. Marion Bank and Tr., Co.*, 378 F. Supp. 3d 1103, 1122 (N.D. Ala. 2019) (citing *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000)) ("Filing a charge of discrimination with the EEOC or filing a subsequent Title VII lawsuit constitutes statutorily protected participation activity.").

Plaintiff describes further acts by him that are alleged to be "statutorily protected expressions," which the Court will analyze under the opposition clause. The opposition clause prohibits employers from discriminating against an employee

24

because the employee opposed an "unlawful employment practice" under Title VII. *See* 42 U.S.C. § 2000e–3(a). The Court finds that, amidst the myriad of complaints made by Plaintiff, most fall outside the purview of Title VII.

Plaintiff made complaints on the following dates: June 3, 2022, complaint with no details on the record, Dkt. 36-1 at 17; March 27, 2024, complaint alleging micromanagement, *id.* at 18–19; June 6, 2024, complaint alleging micromanagement and falsification; Dkt. 151-1 at 12–13; August 19, 2024, complaint alleging an unfair performance evaluation, Dkt. 36-1 at 20; September 30, 2024, complaint regarding unwarranted criticism, baseless accusations, and a toxic work environment, *id.* at 12–13; Dkt. 151-1 at 34–35; November 20, 2024, complaint alleging issues with safety and hygiene in the office, Dkt. 104-13 at 1; Dkt. 151-1 at 8–9; December 5, 2024, complaint alleging issues with mold and COVID-19 in the office, Dkt. 104-13 at 1–2; December 6, 2024, complaint regarding health-related concerns, Dkt. 151-1 at 10; December 18, 2024, complaint alleging lack of organization, ineffective communication, micromanagement, and unfair workloads, Dkt. 104-13 at 2; January 23, 2025, complaint to the Florida Department of Health regarding health-related concerns, Dkt. 151-5 at 25–26; February 5, 2025, complaint with no details on the record, Dkt. 104-1 at 62:10–14; March 5 and 12, 2025, complaints alleging unfair workloads and issues with safety and hygiene in the office, Dkt. 104-15; April 17 and 18, 2025, complaints alleging ADA-related retaliation, Dkt. 151-5 at 6–11; and

April 20, 2025, complaint to the Florida Inspector General regarding the use of Plaintiff's whistleblower complaint in the present litigation. Dkt. 151-6 at 11–12.

Although Plaintiff has certainly expressed opposition in these complaints to certain aspects of DJJ's work culture and environment, these concerns are not related to unlawful employment practices under Title VII, as they did not mention race, color, religion, sex, national origin, opposition to Title VII employment discrimination, or the submission or support of a complaint about Title VII employment discrimination. Therefore, these complaints fall outside the purview of Title VII and were not "statutorily protected expressions." *See* 42 U.S.C. § 2000e–3(a); *see also Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1076 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII."); *Jeronimus v. Polk Cnty. Opportunity Council, Inc.*, 145 F. App'x 319, 326 (11th Cir. 2005) (finding that complaints regarding being "singled out," being subjected to "a campaign of harassment," and working in a "hostile environment" were not "statutorily protected expression[s]" because the plaintiff "never suggested that this treatment was in any way related to his race or sex"); *Duncan v. Madison Cnty.*, 272 F. App'x 859, 863 (11th Cir. 2008) (finding that complaints regarding office conditions did not relate to employment practices forbidden under Title VII, and therefore such complaints are not "statutorily protected expressions").

26

While some of the aforementioned complaints mentioned retaliation, none were specifically related to Title VII employment discrimination. *See, e.g.*, Dkt. 36-1 at 20 (alleging retaliation related to unspecified former complaints—"This is a classic example of retaliation given that I reported [Defendant Clark] previously and others."); Dkt. 151-1 at 12–13 (alleging general retaliation, not related to anything specific—"More so [Defendant Clark] have [sic] demonstrated a pattern of harassment and have engaged in retaliatory harassment."); Dkt. 151-5 at 6–11 (alleging ADA-related retaliation—"[T]he revocation of my telework previleges may constitute *retaliation* in violation of [the ADA]). However, at some point following the March 27, 2025, oral reprimand, Plaintiff complained to HR regarding the various reprimands than he had received. *Id.* at 33–35. He claimed that these were "textbook adverse employment action[s] following protected activity under . . . Title VII[.]" *Id.* at 34. The reference to retaliation under Title VII is sufficient to be considered a "statutorily protected expression."

The remaining complaint left to be analyzed under the opposition clause is Plaintiff's February 7, 2025, charge filed with the FCHR. Dkt. 104-14. Although this complaint does allege color discrimination, which is an unlawful employment practice under Title VII—to establish that this was a "statutorily protected expression," Plaintiff must further demonstrate "that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices,

27

[and] that his belief was *objectively* reasonable in light of the facts and record presented." *Harrison v. Belk, Inc.*, 748 F. App'x 936, 943 (11th Cir. 2018) (quoting *Butler v. Ala. DOT*, 536 F.3d 1209, 1213 (11th Cir. 2008)). "Thus, [Plaintiff] must allege both that he honestly believed [DJJ] was engaged in unlawful employment practices, and that his belief was objectively reasonable." *Ceus v. City of Tampa*, 803 F. App'x 235, 245 (11th Cir. 2020) (citing *Furcron*, 843 F.3d at 1311). "Objective belief is measured against the controlling substantive law." *Id.* (citing *Butler*, 536 F.3d at 1214).

Here, the Court finds that Plaintiff's allegation of color discrimination was not objectively reasonable in light of the facts presented, as the only aspect of the FCHR charge that mentions color merely states that "there appears to be a clear and deliberate pattern of targeting individuals of color in the decision-making process, reinforcing the discriminatory and retaliatory practices within the [DJJ's] workplace." Dkt. 104-14 at 2. Plaintiff provided no supporting facts or further elaboration. Because Title VII color discrimination requires more than mere allegations, *see Word v. AT&T*, 576 F. App'x 908, 914 (11th Cir. 2014), the Court finds Plaintiff's subjective belief that DJJ was engaging in color-based employment discrimination was not objectively reasonable. *See Butler*, 536 F.3d at 1213; *see also Muhammad v. Audio Visual Servs. Grp.*, 380 F. App'x 864, 873 (11th Cir. 2010) (finding that due to a lack of evidence of race discrimination, the plaintiff's "belief

28

that race discrimination had occurred was not objectively reasonable"). Plaintiff further alleges disability discrimination in this charge, Dkt. 104-14 at 1, but this falls outside the purview of Title VII. *See* 42 U.S.C. § 2000e–3(a); 42 U.S.C. § 2000e-2(a)(1) (listing the protected classes as "race, color, religion, sex, or national origin," and not disability). The Court thus finds that the February 7, 2025, FCHR charge was not a "statutorily protected expression."

Therefore, the only "statutorily protected expressions" sufficient for the first element of the prima facie case of retaliation are the following: the May 28, 2019, EEOC charge, the August 12, 2022, EEOC charge, the August 5, 2024, initiation of the present litigation, and the complaint that occurred at some point following the March 27, 2025, oral reprimand.

### b. Adverse Employment Actions & Causation

The second element of a prima facie retaliation claim under Title VII requires a plaintiff to establish an "adverse employment action." *Burlington N. v. White*, 548 U.S. 53, 68 (2006) (citation modified). The third element then requires that any adverse action be shown to be causally related to the statutorily protected expression. *Rosado*, 127 F.4th at 876. The Eleventh Circuit has construed the causation element "broadly," requiring that "a plaintiff need only demonstrate 'that the protected activity and the adverse action were not wholly unrelated.'" *Debe v. State Farm Mut. Auto. Ins. Co.*, 860 F. App'x 637, 639 (11th Cir. 2021) (quoting *Shotz v. City of*

29

*Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)). But, to the extent the only link proffered between the protected activity and the adverse employment action is "temporal proximity," the temporal proximity must be "very close" to infer causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (holding that a three-month period between the expression and the adverse action was not "very close"). "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Here, Plaintiff's claim of Title VII retaliation fails to provide any argument regarding a nexus and has instead offered only conclusory statements. *See* Dkt. 36 ¶¶ 92–94. Construing the Plaintiff's pleading liberally, the Court interprets his claim of Title VII retaliation to rely wholly on temporal proximity to establish causation— i.e., Plaintiff appears to claim that causation exists because he was subject to adverse employment action after he engaged in protected activities.

The first protected activity was Plaintiff's May 28, 2019, EEOC charge. Dkt. 104-7. The claimed adverse employment action closest in time to this charge is the January 20, 2022, counseling memo he received from Defendant Ardito. *See* Dkt. 113-2. Without analyzing whether this action by Defendant Ardito constitutes an

30

adverse employment action, the Court finds that these two events—thirty-one months apart—do not have temporal proximity sufficient to establish causation. *See Thomas*, 506 F.3d at 1364. Thus, Plaintiff fails to establish a prima facie case of retaliation as to the 2019 EEOC charge.

The next protected activity was Plaintiff's August 12, 2022, EEOC charge. Dkt. 104-10. The claimed adverse employment action that is closest in time to this charge is the March 2023 denials of the Assistant Chief and Chief Probation Officer positions. *See* Dkt. 113-1 at 3; Dkt. 115-1 ¶¶ 53–54. Without analyzing whether these actions constitute adverse employment actions, the Court finds that these events—at least six months apart—do not have sufficient temporal proximity sufficient to establish causation. *See Thomas*, 506 F.3d at 1364. Thus, Plaintiff fails to establish a prima facie case of retaliation as to the 2022 EEOC charge.

The next protected activity was the initiation of the present litigation on August 5, 2024. Dkt. 1-1. The claimed adverse employment actions that are closest in time to this charge are Defendant Clark's discussions with Plaintiff about his job performance, Dkt. 104-4 ¶¶ 2–4, Defendant Clark's performance evaluation, *id.* ¶ 5; *see* Dkt. 151-1 at 23, and the January 16, 2025, revocation of Plaintiff's teleworking accommodations. Dkt. 104-12. As an initial matter, without analyzing whether the revocation of accommodations constitutes an adverse employment action, the Court finds that the August 5, 2024, initiation of litigation and the January 16, 2025,

31

revocation—five months apart—do not have sufficient temporal proximity to establish causation. *See Thomas*, 506 F.3d at 1364. This sets the outer bound of what is considered temporally proximate, and thus only Defendant Clark's discussions and his performance evaluation need be analyzed.

Defendant Clark's discussions with Plaintiff were described as occurring "during his time as Plaintiff's supervisor," Dkt. 104-4 ¶ 2, and Defendant Clark held this position from March 2024 until January 2025. *Id.* ¶ 1. Furthermore, Defendant Clark's performance evaluation is described as occurring in "mid-2024." *Id.* ¶ 5. A specific date has not been established by either party for either of these actions—therefore, the Court resolves this ambiguity in favor of Plaintiff, *see Adickes*, 398 U.S. at 157–58; *Jackson*, 372 F.3d at 1280, and will construe these actions as occurring within a time considered temporally proximate to the initiation of litigation. *See Thomas*, 506 F.3d at 1364.

If Defendant Clark's discussions with Plaintiff and performance evaluation are construed as temporally proximate to statutorily protected activity, the Court must then address the second element to determine if these actions constitute "adverse employment actions" sufficient to establish a prima facie retaliation case. *See Burlington N.*, 548 U.S. at 68. To establish the second element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable

32

worker from making or supporting a charge of discrimination." *Id.* The Eleventh Circuit has interpreted the Supreme Court's standard in *Burlington* to "strongly suggest[] that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to [the plaintiff] and thus constitute an adverse employment actions." *Crawford v. Carroll*, 529 F.3d 961, 973 n.13 (11th Cir. 2008).

Although the Court does not find Defendant Clark's performance evaluation to be "materially adverse," *see Rainey v. Holder*, 412 F. App'x 235, 238 (11th Cir. 2011) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1240 (11th Cir. 2001)) ("[W]hen a lower performance evaluation does not result in a 'loss of pay or benefits or further discipline,' it does not constitute an adverse employment action.'"), the Court does find Defendant Clark's discussions with Plaintiff about his job performance to be "materially adverse," as these discussions were more than mere petty and trivial actions, *Crawford*, 529 F.3d at 974 n.13, and "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. Thus, the Court considers these discussions to be an "adverse employment action" sufficient for establishing a prima facie case for retaliation.

The final protected activity was the complaint to HR regarding the oral reprimand that occurred at some point following March 27, 2025. Dkt. 151-5 at 33–

33

35. Because no date is provided for this complaint, the Court resolves this ambiguity in favor of Plaintiff, *see Adickes*, 398 U.S. at 157–58; *Jackson*, 372 F.3d at 1280, and will consider all following actions as temporally proximate. *See Thomas*, 506 F.3d at 1364. The potential adverse employment actions are thus the three notices of investigation Plaintiff received on April 14, 2025, Dkt. 151-6 at 41–46, and the revocation of Plaintiff's teleworking accommodations resulting from his oral reprimand. Dkt. 151-5 at 6–11.

The Court finds the notices and revocation to be "materially adverse," as these were more than mere petty and trivial actions, *Crawford*, 529 F.3d at 974 n.13, and "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. Thus, the Court considers these to be "adverse employment actions" sufficient for establishing a prima facie case for retaliation.

### c. *Legitimate Non-Retaliatory Reason*

The burden, therefore, shifts to Defendant DJJ to articulate a legitimate, non-retaliatory reason for the discussions, notices, and revocation. *Berman*, 160 F.3d at 702; *see Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (noting that "the defendant's burden is merely one of production, not proof," and is "exceedingly light"); *see also on Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738

34

F.2d 1181, 1187 (11th Cir. 1984)) (holding that employers are free to take adverse employment actions for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

Regarding the discussions, at least two instances led to Defendant Clark's discussions with Plaintiff about his job performance. Dkt. 104-4 ¶¶ 3–4. First, Defendant Clark "learned [that] a family of a youth assigned to [Plaintiff's] supervision complained they were not being properly visited in accordance with DJJ policies. They disputed [Plaintiff's] case notes that reflected proper visitation." *Id.* ¶ 3. Additionally, Defendant Clark discovered "discrepancies in [Plaintiff's] timesheet." *Id.* ¶ 19. The Court finds each of these to be legitimate and non-retaliatory reasons for Defendant Clark's discussions with Plaintiff regarding job performance. In response, Plaintiff has argued that the articulated reasoning is fabricated. Dkt. 150-1 at 5–7. The Court rejects this attempted refutation.

Regarding the notices of investigation, each had independent causes. One of the notices was related to Plaintiff reportedly telling his supervisor that she was "going to regret" providing him with his oral reprimand, which she perceived as a threat. Dkt. 151-6 at 45. Another of the notices was related to a report made to DJJ by the parent of two youths alleging that Plaintiff failed to meet with them in person, was delayed in his responses, failed to provide certain information, and became agitated when the parent requested to speak with his supervisor. *Id.* at 43. The last

35

notice was related to another report made to DJJ by the grandmother of a youth regarding Plaintiff's alleged "failure to remove the youth's cell phone as ordered by the court, lack of home visits, refusal to communicate with her regarding [the youth's] progress, failure to speak with guardian when visiting the school, and failure to hold the youth accountable to the terms of her probation." Dkt. 151-4 at 7; Dkt. 151-6 at 41. The Court finds each of these to be legitimate and non-retaliatory reasons for the notices. Plaintiff has failed to provide evidence to refute the reasoning articulated in each of the notices. *See id.* at 41–46.

Regarding the revocation of Plaintiff's teleworking accommodations, this resulted directly from his oral reprimand. Dkt. 110-1 ¶¶ 5–6; Dkt. 104-1 at 108:6–14. Plaintiff was reprimanded regarding his reported violation of certain standards related to job performance; specifically, it was claimed that Plaintiff failed to complete numerous overdue assignments. *See* Dkt. 151-5 at 38–39. The oral reprimand was reportedly provided to Plaintiff in "an effort to correct the . . . unacceptable behavior." *Id.* at 41. The Court finds this to be a legitimate and non-retaliatory reason for the revocation. In response, Plaintiff has argued that the articulated reasoning is contrived merely to justify the retaliation. Dkt. 150-1 at 8. The Court rejects this attempted refutation.

Because DJJ articulated legitimate, non-discriminatory reasons for its conduct, Plaintiff cannot prevail under the *McDonnell Douglas* framework unless he

36

identifies substantial evidence that DJJ's reasoning was pretextual. Plaintiff fails to satisfy this burden. Therefore, Defendant DJJ has successfully rebutted Plaintiff's prima facie case of retaliation.

### d. Convincing Mosaic

The Court lastly turns to the metaphor of the convincing mosaic, but this argument is likewise availing. Even under a "looser frame," *Melton*, 2026 WL 319183, at *5, Plaintiff must still "put forward enough evidence for a reasonable jury to conclude that illegal [retaliation] occurred." *McCreight v. AuburnBank*, 117 F.4th 1322, 1334 (11th Cir. 2024). He has not done so.

Therefore, the Court finds that there are no genuine issues of material fact and that Defendant DJJ is entitled to judgment as a matter of law, as no reasonable jury could find that Plaintiff was a victim of illegal retaliation under Title VII.

## II.    Count III: Retaliatory Hostile Work Environment under Title VII

Defendant DJJ seeks summary judgment on Count III, which alleges a retaliatory hostile work environment under Title VII due to "continuous and pervasive harassment as retaliation for filing an EEOC complaint." Dkt. 36 ¶¶ 124–131.

Although a "retaliatory-hostile-work-environment claim is somewhat of a hybrid of a traditional protected-characteristic-based hostile-work-environment claim and a traditional retaliation claim," the Eleventh Circuit uses the same standard

37

to assess both Title VII retaliation claims and Title VII retaliatory work environment claims. *Buckley v. Sec'y of Army*, 97 F.4th 784, 799 (11th Cir. 2024); *see Debe*, 860 F. App'x at 640 (11th Cir. 2021) (citing *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862-63 (11th Cir. 2020)) (holding that courts should "analyze retaliatory hostile work environment or retaliatory harassment claims like retaliation claims"); *see also Curet v. Ulta Salon, Cosmetics & Fragrance, Inc.*, No. 8:21-cv-1801-VMC-TGW, 2022 WL 4464751, at *6 (M.D. Fla. Sep. 26, 2022) ("Retaliatory hostile work environment claims are analyzed under the same standard as retaliation claims[.]"). However, unlike Title VII retaliation claims, which are based on discrete acts, Title VII retaliatory hostile work environment claims consider the "totality of events that allegedly create[d] a hostile work environment," *Curet*, 2022 WL 4464751, at *6, similar to the more lenient "convincing mosaic" standard.

As with Plaintiff's Title VII retaliation claim, the Court considers Plaintiff's "statutorily protected expression" to be the May 28, 2019, EEOC charge, the August 12, 2022, EEOC charge, the August 5, 2024, initiation of the present litigation, and the complaint regarding the oral reprimand that occurred at some point following March 27, 2025. Plaintiff claims that the retaliatory harassment consisted of "excessive micromanagement, unwarranted scrutiny, baseless disciplinary actions, and negative performance reviews," as well as "public humiliation." Dkt. 36 ¶¶ 124–131.

First, regarding "excessive micromanagement," Plaintiff alleges that DJJ supervisors "imposed unreasonable demands, monitored [him] excessively, and unjustly increased his workload." Dkt. 36 ¶ 127. Plaintiff has failed to provide sufficient evidence of excessive monitoring. As to unreasonable demands, the only evidence that the Court construes as supporting this claim is the complaint made to HR regarding the oral reprimand that occurred at some point following March 27, 2025. Dkt. 151-5 at 33–35. This complaint describes a tight one-week timeline to complete numerous overdue assignments. *Id.* at 33–35, 36–37. However, Plaintiff was offered the assistance of other JPOs to help complete this timeline—it appears he never requested this proposed assistance. *See id.* at 36–37. With respect to the alleged unjust increase in his workload—two separate analyses by Defendant Sheffer found that Plaintiff's workload was in the middle of the distribution, as compared to his coworkers. Dkt. 104-13 at 1–3; Dkt. 104-15.

Next, regarding "unwarranted scrutiny," "baseless disciplinary actions," and "public humiliation," Plaintiff alleges that he was subjected to "unfounded investigations and reprimands" and "ambush-style meetings." Dkt. 36 ¶ 129. There are multiple instances that may fit these claims, but Plaintiff has failed to provide evidence that any of them were unjustified. On January 20, 2022, Plaintiff received a counseling memo from Defendant Ardito regarding an audit of his case notes that revealed certain deficiencies. Dkt. 113-2. On April 25, 2022, the mother of a youth

assigned to Plaintiff filed a complaint with DJJ, alleging that Plaintiff's case notes were falsified—this required Defendant Ardito to file a report with DJJ's CCC hotline. Dkt. 104-8 at 1. Defendant Ardito notified Plaintiff that CCC initiated an investigation. Dkt. 113-3. Following this notification, Plaintiff confronted Defendant Ardito in what was perceived as a threatening manner, and was thus provided with an Employee Assistance Program referral. Dkt. 104-2 ¶ 5. In June 2024, DJJ supervisors met with Plaintiff to discuss discrepancies between his time sheet submissions and his documented case notes. 104-3 ¶ 3; Dkt. 151-1 at 16–17. During his supervision of Plaintiff, Defendant Clark discussed job performance issues with Plaintiff, such as complaints he received from the family of a youth assigned to Plaintiff regarding insufficient visitation. Dkt. 104-4 ¶¶ 2–4. On April 14, 2024, Plaintiff received three notices of investigation, of which their respective causes have already been discussed in a previous analysis. Dkt. 151-6 at 45–46.

Lastly, regarding "negative performance reviews," Plaintiff alleges that "Defendant Ardito authored a retaliatory negative performance review in 2022, filled with inaccuracies, deliberately aimed at discrediting the Plaintiff's work." Dkt. 36 ¶ 128. Plaintiff has failed to provide evidence of inaccuracies regarding the 2022 performance evaluation. Defendant Ardito scored Plaintiff's performance as 3.25 out of 5, indicating "satisfactory" performance. Dkt. 104-9. Defendant Ardito listed several areas for improvement, including communication. *Id.* After reviewing this

40

matter, an EEOC investigator opined that "it is not unusual for ratings to increase or decrease each performance year." Dkt. 36-1.

Even if the Court were to find that Plaintiff was subject to harassment due to the totality of instances detailed, and even if the Court were to find that this claimed harassment was "not wholly unrelated" to Plaintiff's protected activities, *Debe*, 860 F. App'x at 639 (quoting *Shotz*, 344 F.3d at 1180 n.30), the Court still finds that legitimate and non-retaliatory reasons have been articulated for each interaction, as articulated above. This is sufficient to rebut any prima facie case that might be established. Plaintiff has failed to refute the articulated reasoning.

Therefore, the Court finds that there are no genuine issues of material fact and that Defendant DJJ is entitled to judgment as a matter of law, as no reasonable jury could return a verdict for Plaintiff regarding the Title VII claim of retaliatory hostile work environment. Defendant DJJ's motion for summary judgment is thus granted as to Count III.

## III.    Count IV: Retaliatory Failure to Promote under Title VII

Defendant DJJ seeks summary judgment on Count IV, which alleges failure to promote under Title VII done "in retaliation for whistleblowing." *Id.* ¶ 141.

To bring a Title VII claim, a plaintiff must first file a charge of discrimination with the EEOC. *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004). Because of this exhaustion requirement, "a plaintiff's judicial complaint is

41

limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 1280 (citation modified). "The facts alleged in the charge matter most for determining what can reasonably be expected to grow out of an EEOC charge." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022).

Plaintiff's 2022 EEOC charge, from which this case arose, mentions general claims of retaliation and harassment—specifically, Plaintiff mentions lower performance evaluations, counseling memos, meetings, and a comment being made to him about therapy. Dkt. 104-10. Plaintiff fails to allege any facts about Defendant DJJ's hiring practices. *See id.* This is to be expected, as the denials of the Assistant Chief Probation Officer, Chief Probation Officer, and Operations Coordinator positions took place the year following the 2022 EEOC charge. Dkt. 115-1 ¶¶ 33, 53–54. Plaintiff failed to amend his 2022 EEOC charge to add any mention of these denials.

Therefore, even under the "liberal EEOC charge strictures," *Gregory*, 355 F.3d at 1280, the Court finds that Plaintiff has failed to exhaust his administrative remedies regarding his retaliatory failure to promote claim, as this claim could not be reasonably expected to grow out of the facts described in the 2022 EEOC charge. The Court finds that there are no genuine issues of material fact and that Defendant DJJ is entitled to judgment as a matter of law, as no reasonable jury could return a

42

verdict for Plaintiff regarding the Title VII claim of retaliatory failure to promote. Defendant DJJ's motion for summary judgment is thus granted as to Count IV.

## IV.   Count VII: Violation of the Florida Whistleblower Act

Defendant DJJ seeks summary judgment on Count VII, which alleges retaliation against Plaintiff for "exposing unethical conduct" in violation of the Florida Whistleblower Act ("FWA"). *Id.* ¶ 150.

The FWA prohibits the state from retaliating against an employee for disclosing violations of law, threats to public welfare, or acts of gross mismanagement, fraud, abuse, or neglect by the state. Fla. Stat. § 112.3187. Specifically, the FWA protects the disclosure of "[a]ny violation or suspected violation of any federal, state, or local law, rule, or regulation," Fla. Stat. § 112.3187(5), and thus covers a broader range than Title VII retaliation protection, which is limited to disclosures of those types of discrimination protected by Title VII. *See* 42 U.S.C. § 2000e–3(a); 42 U.S.C. § 2000e-2(a)(1) (listing the protected classes as "race, color, religion, sex, or national origin").

The Eleventh Circuit has held that FWA claims and Title VII retaliation claims are governed by the same standard. *Ray v. City of Tallahassee*, 664 F. App'x 816, 818 (11th Cir. 2016) ("Claims under the [FWA] . . . are governed by the burden-shifting standard for Title VII retaliation claims."); *see McAlpin v. Town of Sneads*,

43

61 F.4th 916, 927 (11th Cir. 2023) (utilizing the Title VII retaliation standard for FWA claims).

Thus, because Plaintiff's FWA claim is governed by the same fact pattern and standard as Plaintiff's Title VII retaliation claim, the Court restates and incorporates the analysis of Count I. This resolves all aspects of Plaintiff's FWA claim covered by the prior Title VII analysis—including all allegations of retaliation except for those disability-related allegations of Plaintiff's February 7, 2025, FCHR charge. Dkt. 104-14 at 1. Although the disability-related allegation fell outside the purview of Title VII, it would be considered a "statutorily protected expression" under the FWA, as the FWA protects the disclosure of a suspected violation of *any* state law to an investigative body like the FCHR, Fla. Stat. § 112.3187(5), (6), and Plaintiff's FCHR charge alleged discrimination in violation of "Chapter 760 of the Florida Civil Rights Act," among other laws. Dkt. 104-14 at 1.

With the disability-related allegation of Plaintiff's FCHR charge considered a "statutorily protected expression" sufficient for the first element, the Court proceeds to an analysis of adverse employment actions and causation. Here, like in Count I, Plaintiff has failed to provide any argument regarding a nexus and has instead offered only conclusory statements. *See, e.g.*, Dkt. 36 ¶¶ 150–52. The Court thus similarly interprets the FWA claim to rely wholly on temporal proximity to establish causation.

44

The actions that were temporally proximate to Plaintiff's FCHR charge are as follows: on March 27, 2025, when Plaintiff received an oral reprimand, Dkt. 151-5 at 38–41; on April 1, 2025, when the grandmother of a youth assigned to Plaintiff was given a grievance form after making a complaint about Plaintiff, Dkt. 151-4 at 7; Dkt. 151-6 at 41–42; on April 14, 2025, when Plaintiff received three notices of investigation; Dkt. 151-6 at 41–46; and the revocation of Plaintiff's teleworking accommodations resulting from his oral reprimand. Dkt. 151-5 at 6–11.

Even if the Court were to determine that these actions constituted "adverse employment actions" sufficient to satisfy the second element and establish a prima facie case of retaliation, the Court still finds that legitimate and non-retaliatory reasons have been articulated sufficient to rebut a prima facie case—namely that the oral reprimand was based upon Plaintiff's failure to complete numerous overdue assignments within the required timeframe, Dkt. 151-5 at 38–41; the grievance form was provided in direct response to allegations that Plaintiff failed to properly supervise a youth, Dkt. 151-6 at 41; the three notices of investigation were given for reasons already discussed in a previous analysis, Dkt. 151-6 at 45–46; and the revocation of Plaintiff's teleworking accommodations was related to the aforementioned oral reprimand. *Id.* ¶¶ 49–50. The Court further finds that Plaintiff has failed to put forward sufficient evidence to establish a "convincing mosaic" of retaliation under the FWA.

Therefore, the Court finds that there are no genuine issues of material fact and that Defendant DJJ is entitled to judgment as a matter of law, as no reasonable jury could return a verdict for Plaintiff regarding the FWA retaliation claim. Defendant DJJ's motion for summary judgment is thus granted as to Count VII.

## V.   Count II: First Amendment Retaliation under 42 U.S.C. § 1983

The Individual Defendants seek summary judgment on Count II, which alleges retaliation against Plaintiff for claimed protected activities in violation of the First Amendment under § 1983. Dkt. 36 at 23. The Individual Defendants argue that summary judgment should be granted as to this claim because they are each entitled to qualified immunity. Dkt. 106 at 7–8; Dkt. 107 at 6–7; Dkt. 108 at 8–9; Dkt. 109 at 7–8; Dkt. 110 at 7–8.

The defense of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982); *see Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012). To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citation modified). Once this showing is made, the burden shifts to the plaintiff to show that "(1) the defendant

46

violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* at 1340–41 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).

As an initial matter, there is no dispute that the Individual Defendants were acting within the scope of their discretionary authority as employees of DJJ. Dkt. 36 ¶¶ 96, 116, 123. Indeed, Plaintiff acknowledges that the Individual Defendants were "acting under color of state law" when they took their allegedly violative actions. *Id.* ¶ 96. As such, Plaintiff has the burden to show that the Individual Defendants violated the decedent's First Amendment right against retaliation and that this right was clearly established at the time of the alleged violation.

### a. First Amendment Violation

The "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Lindke v. Freed*, 601 U.S. 187, 196–97 (2024) (citation modified). The state employer must not take an "adverse employment action," which involves an "important condition of employment" and is likely to "chill the exercise of constitutionally protected speech." *Stavropoulos v. Firestone*, 361 F.3d 610, 618–19 (11th Cir. 2004) (citation omitted).[3] When bringing a First Amendment § 1983 claim for retaliation, courts

---

[3] In *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021), the Eleventh Circuit held that although Title VII retaliation claims are now governed by the more lenient "might have dissuaded" standard for adverse employment actions, *see Burlington*, 548 U.S. at 68, First Amendment § 1983 retaliation claims remain subject to the higher *Stavropoulos* requirement that the adverse employment action must "involve an important condition of employment."

apply a "four-stage analysis." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015). The third stage requires a plaintiff to show that his speech was a "substantial motivating factor" in the adverse employment action. *Id.* at 618.

Here, even if the Court were to grant the first two stages—including that the actions of the Individual Defendants were sufficient to meet the higher First Amendment standard for "adverse employment actions"—Plaintiff has failed to establish the third element. He fails to establish any causal relationship by providing no evidence of protected speech playing a "substantial role" in these alleged adverse actions. Instead, Plaintiff has relied wholly on temporal proximity. *See, e.g.*, Dkt. 36 ¶¶ 101 ("Correa's actions intensified immediately after the Plaintiff's reports to Tallahassee in 2024, exposing systemic failures and misconduct within the Department."), 105 ("Ardito's retaliatory conduct began after the Plaintiff reported systemic corruption within DJJ."), 108 ("Clark's actions escalated after the Plaintiff's protected reports to HR and the EEOC."), 112 ("Sheffer's actions occurred shortly after and in direct response to the Plaintiff's constitutionally protected speech."). Therefore, without evaluating the first two stages of the First Amendment retaliation analysis, Plaintiff has failed to establish the third element, an essential part of this claim.[4] The Court finds that there are no genuine issues of

---

361 F.3d at 619. Therefore, a First Amendment § 1983 retaliation claim imposes a higher burden on the plaintiff for establishing an "adverse employment action" than a Title VII retaliation claim.

[4] "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential

material fact and that Plaintiff's First Amendment right against retaliation was thus not violated.

### b.  Clearly Established Right

To defeat a claim of qualified immunity, Plaintiff must establish both that there was a violation of his constitutional rights and that the right was "clearly established" at the time of the Individual Defendants' alleged violations. *Robinson*, 46 F.4th at 1340. Because the Court has concluded that the Individual Defendants did not violate Plaintiff's First Amendment right against retaliation, there is no need to address the "clearly established" prong. *Id.*

The Court finds no genuine issues of material fact and that the Individual Defendants are entitled qualified immunity as to Count II, based on the undisputed record.

## VI.    Count V: Preliminary Injunctive Relief

Because the purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and all claims are now resolved by

---

to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23 (quoting Fed. R. Civ P. 56(c)); *see McGee*, 719 F.3d at 1242 ("[The moving party] has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case.")

49

summary judgment in favor of Defendants—the Court finds Plaintiff's request for preliminary injunctive relief to be moot.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendant Florida Department of Juvenile Justice's Motion for Summary Judgment is **GRANTED** as to Counts I, III, IV, and VII. Dkt. 115.

2. Defendants Andrew Correa, Matthew Clark, Rosa Ardito, Paul Sheffer, and Sean Skillern's Motions for Summary Judgment are **GRANTED** as to Count II. Dkts. 106, 107, 108, 109, 110, 115.

3. Plaintiff's request for Preliminary Injunctive Relief (Count V) is **MOOT**.

4. The Clerk is **DIRECTED** to enter final summary judgment in favor of Defendants Florida Department of Juvenile Justice, Andrew Correa, Matthew Clark, Rosa Ardito, Paul Sheffer, and Sean Skillern and against Plaintiff Quintaurus L. Johnson, and is **DIRECTED** to terminate all pending motions and deadlines and to close the case.

**DONE AND ORDERED** at Tampa, Florida, on February 19, 2026.

_/s/ William F. Jung_
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record

50